UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYDIA DONATI,

    Plaintiff,

v.                                                     Case No. 13-cv-14496

FORD MOTOR COMPANY GENERAL
RETIREMENT PLAN, RETIREMENT
COMMITTEE,

    Defendant.
                                               /

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT**

Pending before the court is a Motion for Judgment, filed by Plaintiff Lydia Donati on December 31, 2014 (Dkt. # 37) and a Cross-Motion for Judgment filed by Defendant Ford Motor Company General Retirement Plan, Retirement Committee on February 4, 2015. (Dkt. # 48.) Having reviewed the briefs, the court concludes a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the court will grant Defendant's cross-motion and deny Plaintiff's motion.

## I. BACKGROUND

### A. The Plan

The Ford Motor Company ("Ford") maintains a General Retirement Plan ("GRP" or the "Plan") for its employees. The GRP is a pension benefit plan within the meaning of ERISA § 3(1), which was funded by contributions from both participants and Ford. (Joint Appendix (hereinafter "JA") 1-2.)

## B. Donati's Retirement Benefits

Lydia L. Donati[1] worked for Ford for fifteen years and retired in good standing. She had been a participant in the GRP during her Ford employment. At the time of her retirement, Donati was a Retired Member who was entitled to receive a Life Income Benefit. (JA 455-56.) "Life Income Benefit" is defined by the Plan as "the portion of the retirement benefits provided in Article VI [Non-Contributory Retirement Benefits] and Article VII [Contributory Retirement Benefits] that continues to be payable, subject to the provisions of the Plan, to a Retired Member during the Member's lifetime." (JA 25.)

Donati had been the spouse of a Ford employee who also participated in the GRP, who was (and is) also a Retired Member entitled to a Life Income Benefit. (JA 501.) When Donati and her husband were divorced, she obtained a Qualified Domestic Relations Order ("QDRO"). ERISA defines a QDRO as a "domestic relations order which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan . . . ." 29 U.S.C. § 1056(d)(B). A portion of Mr. Donati's vested retirement benefits were permanently assigned to Mrs. Donati.

---

[1] Both Plaintiff and her decedent are named Lydia Donati. Although their interests are interchangeable, "Donati" will refer to the deceased and Plaintiff will refer Donati's daughter and attorney-in-fact.

Upon retirement, Donati applied for and began receiving her GRP pension benefits. Donati received monthly checks of $1,184.91 per month, which included her own retirement benefits as well as the portion of her ex-spouse's retirement benefits that were assigned to her as an alternate payee under the QDRO.

### C. The Cash Out

Ford decided to allow certain individuals another payment option for their benefits, known as a "lump sum" or "cash out." Eligible individuals could choose to convert their monthly lifetime benefits to the actuarially equivalent present lump-sum amount, to be paid immediately. (JA 355-425.) This election would be provided on a limited basis, during a "window" of Ford's choosing. Participants had to elect the cash out on Ford's timetable. Ford amended the Plan to provide for this lump sum opportunity. Appendix L of the Plan addresses the lump sum buyout options. In relevant part, the Plan provides for:

> [a] lump sum retirement benefit, which shall be an amount equal to the Actuarial Equivalent lump sum value of the remaining monthly benefits payable, including the following, if applicable:
>
> (i) Life Income Benefit;
> (ii) Supplemental Allowance and/or Temporary Benefit;
> (iii) survivor's benefit;
> (iv) Special Age 65 Benefit; or
> (v) cancellation of survivorship coverage upon death of a spouse.

(JA 329-30.)

On April 27, 2012, Donati received a communication from Ford announcing the Lump Sum Pension Buyout option. (JA 382-83.) The letter identified Donati as eligible for the program. Donati received a postcard in November 2012 stating that she would "receive information by mail about this voluntary opportunity to take the remaining value

of [her] GRP pension benefit of a single lump sum instead of continuing to receive monthly pension benefit payments." (JA 397.) The postcard further stated that the window for her to make the decision would be between December 14, 2012 and March 13, 2013. Donati also received a letter that stated that Ford was "now providing [her] with a new opportunity to take the remaining value of [her GRP] pension benefit as a lump sum" and calculated that benefit as $240,361.49. (JA 426.) This calculation was made using the combined payments Donati was receiving from her own GRP benefit and the QDRO.

Donati completed and timely returned the GRP form, electing the lump sum buyout. Ford received the election kit on January 8, 2013. (JA 451.) Doanti received a letter from Ford dated January 14, 2013 stating that her "submitted election has been reviewed and the information is complete and correct" and that her "lump sum payment is being processed." (JA 386.) The letter further stated that she would "receive [her] last monthly pension benefit payment in May, and [she would] receive [her] lump sum payment approximately one month later." (*Id.*) Donati received another letter, dated February 13, 2013, confirming her election. JA 387. Ford sent another letter in March 2013, again confirming the timing of the cashout. (JA 388.)

On April 5, 2013, Ford sent a letter to Donati informing her that "[a] correction to the data in [her GRP] pension payment Election Kit [was] required. Due to the nature of the correction and to ensure [she] ha[d] time to make an informed decision, [she] ha[d] been moved to a later election period." (JA 390.) Defendant had concluded that the lump sum had been improperly calculated, since it included both her pension benefits

4

and her benefits under the QDRO as an alternate payee. (JA 391.) The recalculated sum valued only her own pension benefits under the GRP and totaled $38,840.34.

Donati died in April 2013. Plaintiff, Donati's daughter, as attorney-in-fact, sent a letter to Ford on May 7, 2013, requesting plan documents pursuant to 29 U.S.C. § 1024(b)(4). (JA 429.) Defendant construed the letter as a claim for benefits. (JA 391.) Defendant explained its reasoning and offered to accept Donati's completed election as to own pension benefits and provide the distribution in amount of $38.840.34, even though she died before she was able to make a new election. (*Id.*) Plaintiff appealed the determination and Defendant reiterated that Donati's kit "was sufficient to make a valid election of a lump sum distribution of the retirement benefit she accrued while working as an employee for [Ford]." (JA 455.) The letter asserted that the "the Plan [was] not legally permitted to pay a lump sum distribution of the benefit Mrs. Donati was receiving as an alternate payee of her ex-spouse." (*Id.*)

### D. Procedural History

Plaintiff Lydia Donati brought this action on October 25, 2013, asserting a cause of action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 (a)(1)(B), claiming that Ford failed to honor her election "of full payment of her benefit" under Ford's General Retirement Plan (the "Plan") as well as a cause of action for breach of fiduciary duty. On January 10, 2014, Ford moved for judgment on the pleadings, seeking to dismiss a cause of action asserting breach of fiduciary duty. (Dkt # 11). Donati moved to amend the complaint to add, *inter alia*, an estoppel claim. (Dkt. # 15). On July 23, 2014, the court granted both motions in relevant part. (Dkt. # 20). The court then deferred consideration of the estoppel claim or (Dkt. # 30), denied

Donati's procedural challenge (Dkt. #30) and entered a *Wilkins*[2] order setting a briefing schedule (Dkt. # 31).

## II. STANDARD

As the agreed by the parties, the standard of review of the denial of benefits is arbitrary and capricious as to the matters entrusted to the Administrator's discretion, including interpretation of the Plan terms and all other matters described in Article XIII, Section 2. Plaintiff takes the position that the Administrator is not endowed with discretion to "take any action not uniformly applicable to all employees similarly situated," Plan Article XIII, Section 2, and review on this issue only could be de novo. Defendant takes the position that review on the denial of benefits claim should be arbitrary and capricious under any circumstances. As discussed below, the court concludes that it need not reach the question of uniform application and reviews Defendant's decision under an arbitrary and capricious standard. However, the court notes that the same result would obtain under de novo review.

## III. DISCUSSION

### A. The Cash Out Unambiguously Applies Only to Donati's Own Retirement Benefit

Plaintiff argues that the terms of the Plan allowed Defendant to include both Donati's own retirement benefits and her ex-husband's benefits in the lump sum payout. According to Plaintiff, the "Life Income Benefit" referred to in the Plan includes both

---

[2]*Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998). *Wilkins* holds that a denial-of-benefits case must be decided on the administrative record, unless the plaintiff can show that a denial of due process occurred. *Moore v. Lafayette Life Insurance Co.*, 458 F.3d 416, 431 (6th Cir. 2006).

6

benefits. In the alternative, Plaintiff argues that the language "including the following . . ." implies a non-restrictive list, leaving open the possibility that her ex-husband's benefit could also be included. Neither of these arguments is persuasive.

"Life Income Benefit" is a defined term, which refers specifically to "the portion of benefits . . . that continues to be payable, subject to the provisions of the Plan, to a Retired Member during the Member's lifetime." This necessarily excludes Donati's ex-spouse's benefits, which were not payable to Donati due to the operation of any provision of the Plan, but instead due to the QDRO. The mere fact that Mr. Donati was also a member of the GRP and Defendants bundled both streams into one monthly payment is irrelevant. Furthermore, Mr. Donati's benefit was not payable "during *Mrs. Donati's* lifetime." Instead, it derived from Mr. Donati's own employment at Ford and was (and perhaps is) subject to its own actuarial calculations for conversion to a lump sum benefit, if and when it becomes the subject of a cash out opportunity.[3]

Although inconsistent with Defendant's initial calculations, this interpretation is consistent with both the Plan's plain language and materials received by Donati. A mailing explained that "[a] lump sum payment provides the total value of all *your* remaining pension benefits in one single payment." (JA 403 (emphasis added).) The portion of Donati's monthly payment that derived from the QDRO was not *her* pension benefit. It was a court ordered payment taken from her ex-spouse's income stream. To be sure, the fact that Mr. Donati was also a Retired Member of the GRP created the

---

[3] The record does not indicate the cash out value of Mrs. Donati's QDRO-mandated share of Mr. Donati's benefit. In any event, whether Mr. Donati was offered a cash out is irrelevant to the instant dispute.

7

confusion that led to this dispute. However, there is no basis for leveraging this similarity to conflate two analytically distinct income streams. Mrs. Donati was an alternate payee who had rights to the benefits payable to Mr. Donati. The GRP does *not* include alternate payee benefits as an element of calculation of "the monthly benefits payable."

To accept Plaintiff's view, Defendant would be required to cash out a QDRO-mandated benefit using the actuarial life expectancy of the spouse, rather than the employee. Doing so would circumvent the detailed and complicated calculations provided for the in the Plan. The clear intention of the plan is that each Retiree may cash out his or her own benefit if presented the opportunity, though "participants who have a [QDRO] may be required to obtain their [former] Spouse's consent . . . to receive payment of the lump sum retirement benefit." (JA 311.) Applied to this case, at Defendant's discretion, Mr. Donati would have been able to receive a cash out of his own Life Income Benefit, but only with Mrs. Donati's consent. There is no support in the language of Plan for Plaintiff's theory that Mrs. Donati (or Defendant for that matter) was empowered to unilaterally cash out the portion of Mr. Donati's Life Income Benefit that Mrs. Donati was receiving through the QDRO.

Consider a scenario where Mr. and Mrs. Donati are each offered a cash out at the same time. The GRP certainly contemplates Mr. Donati cashing out his *entire* benefit, but only with Mrs. Donati's consent. Plaintiff's reading of the GRP would require Defendant to ignore this unambiguous interpretation and include a portion of Mr. Donati's benefit in Mrs. Donati's cash out. The treatment of Mr. Donati's benefit would then be divided—exactly the result Plaintiff insists the court avoid. The better

reading—in fact the only reasonable reading—of the Plan requires each Retired Member's Life Income Benefit to be treated separately.

Plaintiff argues that "[n]othing in the Plan anywhere describes individuals as partially able to elect a cash-out, or qualifiedly eligible, or eligible with respect to only one part of his/her benefit" and that "Donati's 'remaining monthly benefit payable should have been cashed out." (Dkt. # 37, Pg. ID 584-85.) Plaintiff is absolutely correct. Donati was eligible to cash-out *her* entire benefit. Mr. Donati's benefits were never part of this benefit. Plaintiff's extended argument that Donati was "eligible" to cash out misses the mark. Defendant has never disputed that Donati was eligible. The dispute centers on what she was eligible to cash out. The cited cases addressing eligibility do not advance Plaintiff's cause.

Plaintiff's fall-back argument regarding the illustrative use of the word "including" fares no better. In short, Plaintiff asserts that because "monthly benefits payable" is defined as a list "including" if applicable, her Life Income Benefit, the court should include alternate payee benefits as a portion of monthly benefits payable. Such a reading would introduce, rather than eliminate, an ambiguity where none exists. The drafters of the GRP clearly knew how to include language regarding the rights of alternate payees. (*See* JA 102.) The exclusion of alternate payee language in Appendix L implies that alternate payee benefits were *not* intended to be included in the cash-out calculations.

The Plan provisions are clear. The cash-out opportunity applied to Donati's own Life Income Benefits, and not her ex-husband's. Defendant's erroneous communications to the contrary were unfortunate and instilled a false expectation in

Donati and Plaintiff. However, Defendant has agreed to pay exactly what Donati was entitled to under the Plan. By law, consistent with its fiduciary duties, it can do no more.

### B. Discovery into Uniformity of Application Is Not Necessary

Plaintiff reiterates her argument that because she has not had the opportunity to take discovery as to uniform application of plan provisions, the court is not in a position to resolve the question of plan interpretation. However, this inquiry is only necessary if the court finds that the plan terms are open to alternate reasonable interpretations. In this case, the court finds that the GRP is not open to any other reasonable interpretation. Because Defendant could have only lawfully construed the Plan as it did, uniformity of application is irrelevant. Even if the plan terms had been ambiguous, it is possible that Plaintiff would have been successful on estoppel grounds, rendering costly discovery into uniformity of application unnecessary.

### C. The Estoppel Claim Fails

Because the court finds the language of the Plan unambiguous, Plaintiff's estoppel claim must fail. As previously noted, "[p]rinciples of estoppel . . . cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Sprague v. General Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998) (en banc). Because the plan documents here are unambiguous, no estoppel claim may lie.

## IV. CONCLUSION

Accordingly, IT IS ORDERED that Plaintiff's Motion for Judgment is (Dkt. # 37) is DENIED and Defendant's Cross-Motion for Judgment (Dkt. # 48) is GRANTED and the case is DISMISSED WITH PREJUDICE. A separate Judgment will issue.

      s/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated: May 20, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 20, 2015, by electronic and/or ordinary mail.

      s/Lisa Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522